# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EDDIE C. HICKS
MATTHEW L. MORAN
LAWRENCE W. KNITTER

**CRIMINAL COMPLAINT**

FILED
FEB 1 2001
FEB - 1 2001
MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

MAGISTRATE JUDGE DENLOW

CASE NUMBER: **01CR0101**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about November 2000 to February 1, 2001 in Cook County, in the Northern District of Illinois, defendants did, (Track Statutory Language of Offense)

> Knowingly and intentionally conspired with each other and with others known and unknown to possess with intent to distribute a controlled substance, namely, in excess of five kilograms of mixtures containing cocaine, a Schedule II controlled substance,

in violation of Title __21__ United States Code, Section __846__.

I further state that I am a __Special Agent - FBI__ and that this complaint is based on the following facts:
                                    Official Title

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: __X__ Yes ____ No

DOCKETED
FEB 0 5 2001

Signature of Complainant

Sworn to before me and subscribed in my presence,

February 1, 2001                                    at    Chicago, Illinois
Date                                                      City and State

MORTON DENLOW
United States Magistrate Judge
Name & Title of Judicial Officer                          Signature of Judicial Officer

# A F F I D A V I T

I, DANIEL LEE, being first duly sworn on oath, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed for more than 18 years. As an FBI Special Agent, I am an investigative and law enforcement officer of the United States, empowered by law to conduct investigations of, and to make arrests for, narcotics offenses under Title 21, United States Code. I have received special training in the enforcement of laws pertaining to narcotics trafficking and I have participated in numerous narcotics investigations. I have conducted various types of surveillance, and have been involved in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking.

2. This affidavit is submitted in support of a complaint charging EDDIE C. HICKS, MATTHEW L. MORAN, and LAWRENCE W. KNITTER with knowingly and intentionally conspiring with each other and with others known and unknown to possess with intent to distribute a controlled substance, namely, in excess of five kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

3. The facts set forth below are based on my own personal knowledge, my review of investigative reports prepared by other law enforcement agents, my conversations with other law enforcement agents, information provided by a cooperating witness (the "CW"),

and my discussions with other law enforcement agents concerning tapes of visual, non-verbal conduct and activities and related oral communications intercepted pursuant to court orders and tapes of consensually-recorded conversations. Since this affidavit is submitted for the limited purpose of establishing probable cause in support of a complaint, this affidavit does not contain a detailed account of everything that I know about the individuals and events described herein. The affidavit sets forth only those facts which I believe are necessary to establish probable cause in support of the complaint.

### BACKGROUND

4. The CW began cooperating with the government on November 15, 2000, after getting arrested for a federal narcotics offense. The CW provided information concerning, among other things, narcotics trafficking and police corruption:

(a) The CW advised that the CW had information regarding two individuals, EDDIE C. HICKS and MATTHEW L. MORAN, who were involved in "rip-offs" of drug dealers. This information was based in part on personal conversations which the CW had with HICKS and MORAN. The CW advised that while HICKS was employed as Chicago Police Department ("CPD") Officer, he was part of a crew of CPD officers and others, including MATTHEW L. MORAN, which would identify drug dealers believed to be storing large quantities of cash or drugs, obtain a fabricated search warrant to search the location where the money and/or drugs were stored, and execute a

"raid" at the location. The CW advised that HICKS, MORAN, and other CPD officers who were part of their rip-off crew would confiscate any drugs and/or money which they found, and inform those present at the location that the drugs and/or money would be confiscated, but that they would not be arrested.

(b) On one occasion in about 1996, the CW personally informed EDDIE C. HICKS about a residence where drugs and money could be found. The CW knew about the residence based upon information which the CW had received from an associate ("Individual A"). Individual A told the CW that some individuals had ripped off Individual A for a large quantity of money and drugs. Individual A asked the CW whether the CW knew anyone who could get the money and drugs back. The CW contacted HICKS, and HICKS and other members of his crew raided the residence and took the money and drugs. The CW was paid $25,000 for setting up this deal.

(c) The CW advised that HICKS was no longer a CPD officer, but that HICKS and members of his crew continued to participate in rip-offs. The CW advised that on November 14, 2000, the day before the CW's arrest for the narcotics offense referred to above, the CW had a conversation with HICKS, during which HICKS asked whether the CW knew of any potential rip-off targets.

5. CPD records show that (a) EDDIE C. HICKS became a CPD police officer on June 16, 1970 and resigned from the CPD on or

about March 14, 2000; and (b) MATTHEW L. MORAN was a CPD police officer who resigned from the CPD in or about 1982.

### Recorded Conversations Between the CW, HICKS, and MORAN
### December 5, 2000 Meeting

6. On December 5, 2000, the CW had a meeting with EDDIE C. HICKS and MATTHEW L. MORAN at the CW's office in Dolton, Illinois. This meeting was recorded. The following is a summary of portions of the recorded conversation between the CW, HICKS, and MORAN:[1]

(a) The CW said to HICKS and MORAN, "I got a thang and it's solid." (I believe the CW was referring to a definite target for a ripoff).[2] The CW stated that "the dude keeps . . . eight hundred thousand dollars at this spot all the time." The CW said that the rip-off target "ain't no dumb mother fucker and he knows bullshit from the real shit, so we'll need the warrant. How many guys do you think you can get?" (I believe the CW was referring to how many current or former police officers HICKS and MORAN could get to assist in the rip-off). HICKS asked MORAN, "how many do you think we should bring? Two?" MORAN responded, "I guess, I don't

---

[1] The summaries of the consensually-recorded meetings set forth herein are based information provided to me by other law enforcement agents who reviewed the recordings and debriefings of the CW. These summaries are neither verbatim, nor taken from final transcripts.

[2] Throughout this affidavit, I will offer my understanding of consensually-recorded conversations. My understanding is based upon my experience and training, discussions with other law enforcement agents, and information provided by the CW.

4

know, two more would be a stretch." MORAN added, "cause you really hate to bring in any strange people."

(b) The CW asked, "What about the same crew that thing, wasn't it four people?" (I believe the CW was referring to a prior rip-off). HICKS replied, "Yeah, but one guy is not in the City anymore. . . . Shit, but if it's a sure thing he'd fly up here for it." HICKS asked, "Well how often does he (referring to the rip-off target) have it there?" The CW replied, "Practically all the time, but I'm going to make sure it's there on the date we suppose to go in there."

(c) When the CW told HICKS and MORAN that he was going to personally "eyeball" the target premises, HICKS stated, "that's the only way to be sure." The CW added, "right, that we'd be sure so you figure, figure like I say, there's gonna be between five hundred and eight hundred thousand, and the guy says he mostly keep eight hundred thousand there. This is a safe house, so don't worry about no bullshit, that's why he be up there all the time." (I believe "the guy" referred to the CW's fictitious contact who allegedly worked for the purported ripoff target).

(c) The CW told HICKS and MORAN that his contact was providing information to the CW about a proposed ripoff of the ripoff target because the contact was allegedly angry that he was not getting paid by the ripoff target.

(d) The CW assured HICKS and MORAN that his contact would be in the safe house (that is, the target premises) when they go there to do the raid: "he'll be at home, so when you knock on the door and say, you know the police, he just open up, you know he ain't gonna have no drugs or nothing there." HICKS then said, "[h]e'll look at the warrant." The CW stated, "[y]eah, he'll look at the warrant so he'd be alright, you know, so, ah, you figure about four people?" HICKS replied, "[t]hat would be best you know (UI)...," adding that there would be "at least four." HICKS went on to state, "[y]ou know, 'cause I need one with ah, you know take the outside (of the premises) in case, you know so they all will talk on the radio, so the guy never knows how many people actually's there . . . but still need enough people to go in (the premises)." The CW agreed, "right 'cause you figure if you gonna search somebody's house you gonna go in there with more than two or three people, you know." HICKS said "right." The CW then asked, "[s]o, how soon will you know, how many people you can get, or you think we're pretty good on the people." HICKS stated, "I think we're pretty good on them."

### December 8, 2000 Meeting

7. On December 8, 2000, the CW had a meeting with EDDIE C. HICKS at the CW's office in Dolton, Illinois. This meeting was recorded. The following is a summary of portions of the recorded conversation between the CW and HICKS:

6

(a) The CW said that the "young kid, the one who was setting this up. . . said he'd run up to Minnesota take some shit up there he could pick up some money and bring it back here. So that probably be the money that, you know, we gotta a get... So he probably not ah this week. If not next week, the following week for sure. . . ." (I believe the CW was referring to the proposed rip-off which the CW discussed with HICKS and MORAN on December 5, 2000). The CW asked, "you got everybody lined up?" HICKS said, "yeah, (UI) finish talked to everybody."

(b) The CW said that his contact ("the young kid") said that "he gonna have maybe two or three kilos of dope that he want for his cut. He say fuck the money, he, he said he could get, make this money on that." (I believe the CW was referring to the fact the his contact would accept the two or three kilos of dope in exchange for supplying the CW with the information concerning the money in the safe house). HICKS replied, "Everybody got there's own thing."

(c) The CW asked whether HICKS could leave a copy of a search warrant at the safe house so that the rip-off victim would not think that the CW's contact had stolen the money. HICKS asked the CW for the name, height, and weight of the guy whose "dope it is. . . `cause in a warrant you got to describe the perp."

(d) HICKS asked how much money would be at the stash house. The CW replied, "He said he, the guy's known to keep five

hundred, eight thousand dollars. . . . If it's anything in that range we alright, ya know." HICKS said, "And what I was thinking about doing is I take the whole thing, I take everything. They (referring to the other members of rip-off crew) go about their business. I come to you, we count everything." The CW said, "Oh you, you say just take the money and dope from 'em. . . . Oh then you bring it over here?" HICKS replied, "Right. Before you know everybody would just divide it up."

(e) HICKS asked, "he's (the CW's contact) still talking about a week, week and a half, two weeks?" The CW replied, "Right." The CW further said, "Just make sure he's ready with what we gotta do." HICKS said, "(UI) it's just like (UI) I don't like bringing in no new people in on no shit you know because. . .like in the movies, everytime you bring a new mother fucker in. . .It's all bullshit. He's either, got a problem or he's a fuck-up." The CW said, "Yeah, we don't need no fuck-ups though. Just make sure everybody's, know the, they're, what page they on, shit." HICKS replied, "Well that why I said I wanna, they just give me everything, I come over here and we get everything straight then I give him. . . ."

### December 20, 2000 Interception Orders

8. On December 20, 2000, Chief Judge Marvin E. Aspen entered orders (hereinafter "the Court's interception orders of December 20, 2000") authorizing the interception of oral communications and

visual, non-verbal activities of EDDIE C. HICKS, MATTHEW L. MORAN, and others occurring in and immediately outside an apartment on the second floor of a building located on West 58th Street in Chicago, Illinois (the "West 58th Street apartment").

9. On December 20, 2000, the CW had a consensually-recorded meeting with EDDIE C. HICKS. During the conversation, the CW furnished HICKS with the name and address of a putative drug dealer. Specifically, the CW supplied the name of "[Individual B]" and the address of the West 58th Street apartment. The CW told HICKS that Individual B would have a quantity of United States narcotics and United States currency in the apartment.

10. The following information is based in part on interceptions conducted pursuant to the Court's interception orders of December 20, 2000:

(a) Shortly before 8:00 p.m on December 21, 2000, MATTHEW L. MORAN and LAWRENCE W. KNITTER drove up to a building in which the West 58th Street is located in a Ford Crown Victoria which appeared to be an unmarked police car. LAWRENCE W. KNITTER is a Motor Maintenance Mechanic employed by CPD. The Ford Crown Victoria bore the Illinois license plate number, M74688. According to Illinois Secretary of State records, Illinois license plate number M74688, is registered to a 1990 Chevrolet which was owned by CPD. According to CPD records, the 1990 Chevrolet with license tag M74688 was taken out of service in 1995.

9

(b) Shortly after 8:00 p.m., an unidentified voice which appeared to be emanating from the area in front of the West 58th Street apartment said, "police, police, we're looking for [Individual B]." A short time later, there was loud knocking and then a loud cracking noise. A hidden camera in the apartment then recorded MORAN and KNITTER enter the apartment. Although he is not a CPD officer, KNITTER was wearing what appeared to be a Chicago Police Department bullet-proof vest and police equipment belt and he was carrying a radio from which was emanating transmissions which appeared to be coming from a police dispatcher.

(c) After entering the apartment, MORAN and KNITTER proceeded to search the apartment. KNITTER discovered approximately $2,000 in United States currency which the FBI had placed in a tin can in the dining room of the apartment. KNITTER placed this cash into his jacket pocket. MORAN discovered approximately $1,000 in United States currency which the FBI had placed in a couch in the living room the apartment. MORAN placed this cash into his jacket pocket. After completing the search of the target premises, MORAN and KNITTER departed the apartment at approximately 8:23 p.m. on December 21, 2000. Neither MORAN nor KNITTER are police officers and no search warrant was left behind at the premises.

11. Later in the evening on December 21, 2000, the CW had a consensually-recorded meeting with EDDIE C. HICKS at the CW's

office. During the conversation, HICKS stated that the West 58th Street apartment had been searched and that $1,500 in United States currency had been taken.[3] The CW said that the narcotics had been moved from the purported stash house before the members of HICKS's crew had arrived. HICKS indicated that he and the other members of his crew would be interested in participating in additional rip-offs with the assistance of the CW.

12. On January 26, 2001, the CW had a consensually-recorded conversation with EDDIE C. HICKS. During the conversation, the CW furnished HICKS with the name and address of another putative drug dealer who was a good rip-off target. Specifically, the CW supplied the name of "[Individual C]" and the address of an apartment located on West 67th Street in Chicago, Illinois ("the West 67th Street apartment"). The CW told HICKS that the CW had a contact who worked for Individual C, and that the CW's contact would notify the CW as to when Individual C would have narcotics and United States currency in the apartment.

### January 31, 2001 Interception Orders

13. On January 31, 2001, Chief Judge Marvin E. Aspen entered orders (hereinafter "the Court's interception orders of January 31, 2001") authorizing the interception of oral communications and visual, non-verbal activities of EDDIE C. HICKS, MATTHEW L. MORAN,

---

[3] In fact, MORAN and KNITTER took a total of $3000 in United States currency from the purported stash house.

11

LAWRENCE W. KNITTER, and others occurring in and immediately outside the West 67th Street apartment.

14. On January 31, 2001, at approximately 6:55 p.m., the CW had a consensually-recorded telephone conversation with EDDIE C. HICKS. During the conversation, the CW told HICKS that the CW had learned from his contact (referred to in paragraph 12 above) that Individual C currently had about "five keys of dope" and a large quantity of United States currency in the West 67th Street apartment, that the "dope" was located in the cabinet under the sink, that there was cash in the refrigerator and in the cabinet under the sink, and that Individual C and the CW's contact would be out of the apartment for awhile.

15. The following information is based in part on interceptions conducted pursuant to the Court's interception orders of January 31, 2001:

(a) At approximately 7:40 p.m on January 31, 2001, MATTHEW L. MORAN, LAWRENCE W. KNITTER, and an unidentified white male entered the West 67th Street apartment. KNITTER was again wearing what appeared to be a Chicago Police Department bullet-proof vest and police equipment belt and he was carrying what appeared to be a police radio. MORAN displayed a firearm during part of the time in which he was in the apartment.

(b) After entering the apartment at approximately 7:40 p.m., MORAN, KNITTER, and the unidentified white male proceeded to search

12

the apartment. They remained in the apartment until approximately 8:22 p.m. During this period, MORAN, KNITTER, and the unidentified white male located and took possession of one bundle of cash in the refrigerator and one bundle of cash in the cabinet under the sink. The FBI had previously placed two bundles of cash totaling $10,000 in the apartment.

(c) At approximately 8:00 p.m, KNITTER used a cellular telephone to a make a phone call. (Based on subsequent events summarized below, I believe that KNITTER was talking to EDDIE C. HICKS). KNITTER said in part "We haven't got it yet. We got two handfuls. Stay out there just a few more minutes. We're still looking."

(d) A few minutes after this call, at approximately 8:08 p.m., HICKS had a consensually-recorded telephone conversation with the CW. During this conversation, HICKS said to the CW, "They got two bundles of money, none of that five stuff (I believe HICKS was referring to the "five keys of dope" referred to in paragraph 14 above) and none of that other things." (I believe HICKS was referring to bundles of additional money).

(e) At approximately 8:11 p.m., HICKS had another consensually-recorded telephone conversation with the CW. During this conversation, HICKS asked the CW, "Is it supposed to be there?" The CW replied, "Yeah, look in the frig." HICKS responded, "They found one there and one under the sink." The CW

13

said to HICKS, "Ask if they found any dope." HICKS replied, "No, but they're still in there."

(f)     At approximately 8:19 p.m., HICKS had another consensually-recorded telephone conversation with the CW. During this conversation, the CW advised HICKS that the CW had just learned from the CW's contact that the purported drug dealer, Individual B, had taken "it" (I believe that the CW was referring to the "five keys of dope" and the additional cash) to Minnesota, and that the CW's contact had not been unable to so notify the CW earlier because the contact had been with Individual B. HICKS told the CW, "We'll shoot out there tonight (I believe that HICKS was referring to the CW's office) and get it over with. It won't be much because they only found only two bundles."

16. Later in the evening on January 31, 2001, the CW had a consensually-recorded and video-taped meeting with HICKS and MORAN at the CW's office:

(a) During the meeting, HICKS stated that the West 67th Street apartment had been searched and that $5,000 in United States currency had been taken.[4] HICKS provided $995 in United States currency to the CW in payment for the CW's assistance with the rip-off. During the meeting, MORAN stated he was looking for

---

[4] In fact, MORAN, KNITTER, and the unidentified white male took a total of $10,000 in United States currency from the purported stash house.

narcotics and cash in the apartment, but that he only found cash. MORAN said the next rip-off be set up as a traffic stop of a drug dealer, rather than as an apartment search.

17. Based on the foregoing information, there is probable cause to believe that EDDIE C. HICKS, MATTHEW L. MORAN, and LAWRENCE W. KNITTER knowingly and intentionally conspired with each other and with others known and unknown to possess with intent to distribute a controlled substance, namely, in excess of five kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

DANIEL LEE
FBI Special Agent

Subscribed and sworn to before me this 1st day of February, 2001.

MORTON DENLOW
United States Magistrate Judge

15