UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    01 CR 101 |
| v. | ) | Judge Joan Humphrey Lefkow |
| | ) | |
| EDDIE C. HICKS, a/k/a "David Rose" | ) | |

## MOTION TO ADMIT EVIDENCE
## PURSUANT TO FED. R. EVID. 801(d)(2)(E)

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,

United States Attorney for the Northern District of Illinois, moves this court to admit

certain statements against defendant EDDIE C. HICKS pursuant to Fed. R.

Evid. 801(d)(2)(E) and *United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978).

## I.    INTRODUCTION

This submission begins by providing an overview of the conspiracies that will

be established at trial. It then discusses the law governing the admissibility of

coconspirator statements under Rule 801(d)(2)(E), and outlines some of the evidence

establishing the conspiracies in this case. Finally, it summarizes the anticipated trial

evidence that will support admission of the subject coconspirators' statements. Based

on the following, the government seeks admission of certain statements pursuant to

Rule 801(d)(2)(E), and requests that this Court issue a pretrial ruling of admissibility

of those statements, in accord with *Santiago*, 582 F.2d at 1130–31, and established

practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009);

*United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

## II.    OVERVIEW OF CHARGED CONSPIRACIES

Count One of the indictment charges that from in or about the early 1990s and continuing until on or about February 1, 2001, HICKS, Larry Hargrove, Matthew Moran, and Lawrence Knitter conspired to commit the offense of racketeering, in violation of Title 18, United States Code, Section 1962(d).   Count Two charges that during this same period the same four defendants, together with Albert M. Fontana, conspired to possess with intent to distribute cocaine and marijuana, in violation of Title 21, United States Code, Section 846.   Count Four charges that during this same period HICKS, Hargrove, Moran, and Knitter conspired to commit robbery and extortion, in violation of Title 18, United States Code, Section 1951.

From approximately 1992 and continuing until on or about February 1, 2001, HICKS led a robbery crew consisting of himself, Hargrove, Moran, and Knitter   that targeted individuals believed to be engaged in narcotics trafficking.   HICKS and Hargrove were employed as Chicago Police officers during nearly all of this period. Knitter and Moran were civilians. HICKS and the other members of the crew conducted and attempted to conduct numerous robberies, extortions, and thefts of property, including narcotics, United States currency, and firearms from suspected drug dealers in Chicago and in some south suburban communities. The crew members divided the United States currency among themselves; the narcotics were resold to

other narcotics dealers and the crew members shared in the cash proceeds of those sales.

## III.    GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A.    Existence of and Membership in the Conspiracy

Under *Santiago*, the trial judge must preliminarily determine whether statements by a coconspirator of the defendant will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members

---

[1]    No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements offered for their truth against a defendant.    Such statements are not testimonial, and therefore are not subject to the Confrontation Clause.    *See United States v. Nicksion,* 628 F.3d 368, 374 (7th Cir. 2010); *see also United States v. Hargrove,* 508 F.3d 445, 448-49 (7th Cir. 2007) (providing that "coconspirator statements…are neither hearsay nor 'testimonial' as the Supreme Court has defined that term in [*Davis v. Washington,*    547 U.S. 813, 823-24 (2006)])."

of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: 1) a conspiracy existed; 2) the defendant and declarant were members of the conspiracy; and 3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134–35; *see also Alviar*, 573 F.3d at 540. According to *Bourjaily v. United States*, 483 U.S. 171, 176–81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid. 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of coconspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990)

(en banc).

While the court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178, 180; *Harris*, 585 F.3d at 398-99, the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v Johnson,* 592 F.3d 749, 754–55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548–50 (7th Cir. 1979). The government need only establish the

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy).

existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549–50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant has agreed with every coconspirator or schemer. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his involvement at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th

Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("[I]t is irrelevant when the defendant joined the conspiracy so long as he joined it at some point."). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604–05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## B.    The "In Furtherance of" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937–38. The "coconspirator's statement need not

have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). "Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2–3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

      a.     to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;

      b.     to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

      c.     to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

      d.     as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073–74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890–91 (7th Cir. 2007);

      e.     to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

f.      to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341*,* 1343–44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

g.      to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659–60 (7th Cir. 1995);

h.      to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

i.      to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008); and

j.      "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. Appx. 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## IV. GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF THE CHARGED CONSPIRACIES

The evidence of the charged conspiracies, summarized below,[3] is strong and meets the preponderance of the evidence standard. At trial, the government will present audio- and video-recorded evidence, witness testimony, photo array identification evidence, physical evidence, including forged search warrants, firearms, and cash seized from the conspirators at the time of their arrests, telephone records, CPD records, and other evidence, which will establish as follows:

From approximately 1992 and continuing until on or about February 1, 2001, HICKS, Hargrove, Moran, and Knitter associated together for the purpose of engaging in an organized plan and scheme to obtain cash, narcotics, and property through robberies, extortions, and thefts from individuals whom they believed to be engaged in narcotics trafficking.

CPD records reflect that HICKS and Hargrove were long-time CPD officers who each held the rank of Sergeant during the entire conspiracy period. HICKS was also assigned to CPD's Narcotics Section from approximately 1992 to February 1997. Knitter was employed by CPD as a civilian electrical mechanic during the conspiracy

---

[3] The government does not detail here all of its evidence in support of the existence of the conspiracies and HICKS's and other declarants' participation in it. Rather, this proffer highlights for the Court some of the government's evidence in order to establish, by a preponderance of the evidence, the existence of the conspiracies and the roles of the various conspirators. Thus, this proffer does not list all of the government's witnesses, nor does it provide all of the evidence that will be presented by those witnesses who are named.

period. Moran was not a CPD employee. Neither Knitter nor Moran had any authority to participate in searches or seizures of evidence with CPD officers.

Larry Knitter pled guilty to the racketeering conspiracy charged in Count One pursuant to a cooperation plea agreement, was sentenced to a term of imprisonment of 112 months, and has now completed service of that sentence. Knitter will testify that between approximately 1992 and January 31, 2001, he along with HICKS, Hargrove, and Moran conducted and attempted to conduct numerous robberies, extortions, and thefts of property from suspected drug dealers in Chicago and in various south suburban communities, including Dolton, Harvey, Richton Park, Matteson, and Calumet Park, as well an attempted robbery of suspected drug dealer at an apartment complex in Alsip in April 1999.

Now-retired members of the Alsip police department will also testify about the circumstances of the attempted robbery in Alsip in April 1999 by HICKS, Hargrove, Knitter, and Moran.

HICKS and Moran were also captured on consensually-recorded audio and video conspiring to rob two apartments in Chicago which they believed to be stash apartments used by narcotics dealers, but which, in fact, were FBI undercover apartments. Knitter and Moran were captured via court-authorized interceptions searching and removing money from inside the two purported stash apartments.

Knitter will testify that the robberies, extortions, and thefts occurred during automobile stops of suspected drug dealers or during illegal raids of homes,

apartments, and hotel rooms used by suspected drug dealers.   During the robberies, extortions, and thefts, the conspirators obtained cash totaling in the tens of thousands, wholesale quantities of cocaine and marijuana, and property, including firearms, from the suspected drug dealers.

The information concerning suspected narcotics dealers whom the conspirators targeted for robberies, extortions, and thefts was usually obtained by HICKS. HICKS obtained some of this information from drug dealers, including Arthur ("Pete") Veal and an individual with the nickname of "Sugarbear."   HICKS typically obtained the name, address, and physical description of the suspected narcotics dealer. As discussed below, Veal later began cooperating with the FBI and consensually-recorded conversations with HICKS and Moran concerning the illegal raids of the two FBI undercover apartments.

Knitter will testify that Moran typically prepared false and forged search warrants to facilitate the robberies, extortions, and thefts.   The bogus search warrants were purportedly signed by a Circuit Court of Cook County judge and purported to authorize the seizure of controlled substances, cash, and other items. Moran prepared these false and forged search warrants using the name, address, and physical description of the target provided by HICKS. The complainant listed on the bogus search warrants was a fictitious person with the title "Special Agent of the DEA Task Force."   Six of the bogus search warrants were recovered from the residence of Moran at the time of his arrest in this case, including the two bogus search warrants

that Moran prepared in connection with the raid of one of the FBI undercover apartments.

Before the robberies, extortions, or thefts, the conspirators typically met at a location near the CPD 2nd District police station at 51st and Wentworth. The conspirators referred to this location as the "Gym." Using his position as a CPD electric mechanic, Knitter obtained unmarked police cars from the CPD motor pool for the conspirators to use to travel to and from the locations of the raids. Knitter, sometimes assisted by Moran, would replace the license plates on the unmarked CPD cars with license plates taken from CPD vehicles that were no longer in service. An Alsip police officer observed the crew using one such bogus license plate during the attempted robbery in Alsip in April 1999.

The conspirators each possessed and carried firearms during the robberies, extortions, and thefts to instill fear in the individuals being robbed or extorted, to provide security for each other, and to protect the drugs, money, and other property taken during the illegal raids and car stops. HICKS and Hargrove each carried their official CPD star or badges on their persons during the robberies, extortions, and thefts. Moran and Knitter also possessed and used counterfeit CPD badges to create the false appearance that they were duly sworn CPD officers.

When the target of the robbery was located in an automobile, HICKS, Hargrove, Moran, and Knitter pulled over the vehicle occupied by the suspected drug dealer and represented themselves to be police or DEA Task Force officers. After removing the

occupants of the vehicle, the conspirators searched the vehicle and took any cash, narcotics, and firearms which were found. The occupants of the vehicles were then released without being charged. The conspirators later divided up the illegally-obtained property as summarized in more detail below.

Knitter will testify that the bulk of the crew's criminal activity involved illegal raids of homes, apartments, and hotel rooms used by suspected drug dealers. HICKS, Hargrove, Moran, and Knitter traveled to the locations with a false and forged search warrant. At the location, the conspirators announced to the occupants that they were DEA Task Force officers and that they were there to execute a search warrant. If necessary, Knitter or Moran displayed a copy of the false and forged search warrant to the occupants of the location.

Once inside the location, Moran's duties included restraining or standing guard over any occupants of the locations, while HICKS, Hargrove, and Knitter searched the location for cash, narcotics, firearms, and other items of value. The conspirators took any cash or contraband which was found. The occupants of the location were released without being charged.

The crew members divided the cash taken during the robberies, extortions, and thefts among themselves on their way back to the "Gym" after the illegal raids, or sometimes at Moran's residence in Chicago. A portion of the cash was usually set aside to pay the source who had provided HICKS with the information about the target to be robbed or extorted. The narcotics obtained during the robberies and thefts was

turned over to HICKS, who arranged to have the narcotics delivered to third parties. In exchange for the narcotics, HICKS received United States currency, which he shared with the other conspirators and the sources who had provided information about the robbery or extortion target.

The robberies, extortions, and thefts that HICKS, Hargrove, Moran, and Knitter participated in included, but were not limited to, the following:

(a)     the theft of thousands of dollars in cash stored inside a grocery bag from the residence of a suspected drug dealer located in the vicinity of 119th and Aberdeen in Chicago in approximately 1993;

(b)     the robbery and extortion of approximately $2,000 in cash from a suspected drug dealer at a residence in Calumet Park, Illinois, in approximately November 1993;

(c)     the robbery of cash from a building located on the west-side of Chicago in approximately the spring of 1994;

(d)     the robbery of approximately $50,000 in cash which was stored in a shoebox above some ceiling tiles of the apartment of a suspected drug dealer in the area of 51st and Wabash in Chicago in approximately the summer of 1994;

(e)     the theft of a 9 millimeter Ruger firearm from a residence in Richton Park, Illinois, in approximately spring 1995;

(f)     the robbery of approximately two kilograms of cocaine and a quantity of cash from the apartment of a suspected narcotics dealer located in the vicinity of Madison and Keeler on the west-side of Chicago in approximately July or August 1995;

(g)     the robbery of at least one kilogram of cocaine from two female suspected narcotics dealers at a motel in the area of 8th and South Michigan Avenue in Chicago in approximately August or September 1995;

(h)     the robbery of a large quantity of marijuana and a quantity of United States currency from an individual at a residence in or around Dolton, Illinois, in the fall of 1996 or 1997;

(i)     beginning in approximately 1998, the members of the crew discussed a plan whereby they would rob a multi-million dollar quantity of money from a tractor-trailer which was being used by a cocaine organization to transport drug money from Chicago to Texas. Under the plan, Leroy Elam, a member of the cocaine organization, would furnish information to HICKS's crew about the exact location of the truck, so HICKS's crew could steal the money. In exchange, Elam would share in the proceeds of the robbery. The plan ultimately did not forward.

(j)     the robbery of approximately $50,000 in cash from the residence of a suspected drug dealer in Matteson, Illinois, in approximately early April 1999;

(k)     in approximately mid-April 1999, Hicks, Hargrove, Moran, and Knitter agreed to rob cash from a suspected dealer in an apartment located in Alsip, Illinois ("the Alsip apartment") which they understood to be a stash house for a narcotics

dealer. During the late evening of April 19, 1999, HICKS, Hargrove, Moran, and Knitter unlawfully entered the Alsip apartment and presented a false and forged search warrant to the occupant. The occupant of the apartment was restrained in handcuffs, while HICKS, Hargrove, and Knitter searched for the drug money. As they were leaving the apartment after the search was completed, the crew members were approached by officers of the Alsip Police Department who were responding to a 911 call.

The responding Alsip police officers will testify that HICKS, Hargrove, Moran, and Knitter falsely represented that they had been conducting a lawful search warrant at the apartment. In truth, CPD records reflect that HICKS was not even on duty as a CPD officer at the time. Hargrove had left his duty station as a watch commander at a police station on 111th Street in Chicago to participate in the attempted robbery. Knitter and Moran again were not police officers at all. Moran gave a false name to the Alsip police officers and presented a counterfeit CPD badge to them. Knitter also gave a false name to the Alsip police officers.

HICKS was identified at the scene based on his CPD star number and City of Chicago employee identification number which he furnished to an Alsip police officer. Two Alsip police officers also picked HICKS out of a photo array about a week after the attempted robbery. Hargrove was also identified at the scene based on his CPD star number which he supplied to an Alsip police officer. Two Alsip police officers also picked Hargrove out of a photo array about a week after the attempted robbery.

## FBI Undercover Apartments

As discussed above, Arthur "Pete" Veal was a drug dealer who had supplied information to HICKS in the past about robbery and extortion targets. In late 2000, Veal was arrested on federal narcotics charges and began cooperating with the FBI. HICKS had retired from CPD by that point in time, but, as explained below, was still interested in participating in robberies and extortions with the crew.

Based on the cooperation of Veal, the FBI devised an undercover scenario under which Veal would represent to HICKS that Veal was receiving information from a "young guy" who worked for a narcotics dealer who was moving cocaine and drug money between Chicago and Minnesota. The scenario was that the "young guy" was angry because he was not being paid enough by the drug dealer and was thus willing to set up the drug dealer for a ripoff in exchange for a share of the spoils.

The undercover operation spawned a number of consensually-recorded conversations in which HICKS and Moran participated. These recorded conversations, together with the testimony of Knitter, court-authorized video interceptions, surveillance, telephone records, and other evidence will establish that during December 2000 and January 2001, HICKS, Moran, and Knitter agreed to rob a quantity of cash and cocaine from two apartments on the west-side of Chicago which the "young guy" had identified and which they believed to be real stash locations, but which in fact were FBI undercover apartments. One undercover apartment was located on West 58th Street and the other was located on West 67th Street.

Veal, under the direction and supervision of the FBI, had number of conversations with HICKS and Moran during December 2000 and January 2001, which were audio- and/or video-recorded with the consent of Veal. Veal died in 2016. However, the FBI agents who took custody of these recordings after they were made and entered them into evidence will testify at trial to establish a chain of custody for the recordings. HICKS's identity as a participant in the recorded conversations will be established by, among other things, the fact that he identified himself as "Eddie Hicks" and "Sergeant Hicks" while being video-recorded talking on the telephone to third parties, surveillance, the testimony of Knitter, a visual comparison between the booking photo of HICKS and the video images, a comparison of the voice of HICKS speaking on video recordings and on MCC recorded calls with the voice on the audio-only recordings. Moran's identity as a participant in certain of the recorded conversations will be established by, among other things, surveillance, the testimony of Knitter, a visual comparison between the booking photo of Moran and the video images, and comparison of the voice of Moran speaking on video recordings with the voice on the audio-only recordings.

(l)   West 58th Street Undercover Apartment

## December 18, 2000 Audio-Recorded Meeting[4]

On December 18, 2000, Veal had an audio-recorded meeting with HICKS at

Veal's office in the Dolton area.   This conversation included the following:

VEAL:        So I know he just got back from Minnesota today, so I supposed to get
             with him probably this evening.   Right now we're looking at Wednesday.
             His place is over on, uh... He told me 50 hundred some block on Whipple.
             Where's Whipple? Is that in the...

HICKS:       Whipple (UI).

VEAL :       Is that the west side?   He said it's not too far from Kedzie.

HICKS:       (UI).

VEAL :       Okay, so that southwest side, like, isn't it?

HICKS:       Southwest side.

                        * * * *

HICKS:       Well, I would like to, I hope we get that shit in bundles because (UI) over
             there.

VEAL :       More than likely.   It's probably, you know how, how it's usually...

HICKS:       (UI) bundles (UI).

VEAL :       Yeah, yeah. I hope it's $10,000 bundles.

HICKS:       Right.

VEAL :       That (UI) would make it real easy, you know.

---

[4] Draft transcripts of recorded conversations have been provided to defense counsel, along
with the recording themselves.

HICKS:      Yeah, I can't see how it can be any other way, really. When you got, got
            that type of money you're talking about (UI).

VEAL :      Right. It could be loose, so you got to put in into bundles, so your...

                              * * * *

VEAL :      But Matt [Moran] will have a search warrant, though, won't he?

HICKS:      (UI).

VEAL:       Yeah, so as long as we have a search warrant, it really doesn't make no
            difference who there.

HICKS:      No, it just make it easier because (UI).

VEAL:       I'm gonna know where the money, money is at.

HICKS:      Mmm mmm.

VEAL:       You know so...

HICKS:      (UI).

VEAL:       Whether he's there or not, we'll know where the money is.

HICKS:      Alright.

VEAL:       So...

HICKS:      Because uh you really can't hide that money...

                              * * * *

VEAL :      When you all went to Alsip that time, whatever happened to the money
            then? [referring to the attempted robbery by the crew in Alsip in April
            1999, see paragraph (k) on pages 16-17 above].

HICKS:      Wasn't there.

VEAL :      Was it supposed to be there?

HICKS:      Yeah.

VEAL:       What'd...they move it, or do what?

HICKS:      I don't know (UI). Like when we get into it, I looked around at the uh, it looked like he had, like he had his bag (UI) like you carry money in it (UI) gym bag or shit, (UI), so you know.

VEAL:       He probably had just moved it (UI).

HICKS:      Which is (UI) as luck turned out, it probably was for the best.

VEAL:       I don't know, shit. If you had the money, he probably wouldn't uh, they didn't search you all or nothing, so just head back with your shit.

HICKS:      Right, well, he might have had a different...

VEAL:       Oh, he might have been (UI) behind, yeah, yeah, yeah.

                                    * * * *

HICKS:      And uh they shouldn't be in there for 15 or 20 minutes.

VEAL:       Yeah, because, you know, where the money's at already, so it shouldn't take but a minute. What you gonna tell him, "okay, we gonna give you a break. We didn't find nothing?"

HICKS:      Yeah (UI). Take him a (UI) couple blocks and dump him out.

VEAL :      Oh then, put him out, oh, okay [referring to the purported drug dealer].

HICKS:      (UI) walk back and (UI). That's just to cut down on that immediate phone call shit.

VEAL:       Right, right, right. But, shit, who he gonna call, shit.

HICKS:      Yeah.

VEAL:       You gotta think about that, too.

HICKS:      (UI).

VEAL:          He can't call the police, shit.

HICKS:         Yeah.

VEAL :         Call the police, they say (UI) what you owe. You know, shit.

HICKS:         These guys uh (UI), like you said, half a chance you just be grateful he's not going to jail.

VEAL :         Right uh, what I understand I mean, he just going to be satisfied, he ain't going to jail.

                              * * * *

VEAL:          We gonna do this in the evening time, so...

HICKS:         (UI) I mean yeah in the evening.

VEAL:          (UI) yeah the evening time is better anyway (UI) I figure.

HICKS:         Dark.

VEAL :         (UI) dark, right.

HICKS:         (UI) is out there. It could be a situation where, uh, we want to, whatever happenin' (UI) the fewer people that look at you, the better off you are.

                              * * * *

HICKS:         How old is he, 28?

VEAL :         I think he 28. I know he's in his 20's. He just trying to, to get him some money (UI) [referring to the "young guy" who was purportedly providing the tip about the location of the stash apartment]

HICKS:         (UI).

VEAL:          Yeah, (UI) money, shit, you know.

HICKS:         (UI). He can parlay that (UI) money...

VEAL:      More so than with the money, cause if get the money he gotta go and try to buy some drugs with it. If he gets the dope, he knows how to work that shit.

HICKS:     Well, I got the impression since you say that he didn't want to fuck with the money, you wanna get all the dope, there's probably a good (UI)...

VEAL :     A good piece of dope there, yeah.

HICKS:     So, 100,000 (UI) how much dope is there (UI)? He say 100,000 dollars (UI).

VEAL :     Right, right, right. See might be 15 to 20 ki's in there.

HICKS:     Then we work out a new deal. You ain't gotta tell him that, though.

VEAL :     (UI) shit (UI). He'll know what there, (UI) still don't know it was gonna be like this, ah, you know.

HICKS:     (UI) you say 15 ki's.

VEAL:      (UI).

HICKS:     How much a ki going for?

VEAL:      Probably about 20.

HICKS:     (UI) well you give him everything (UI).

VEAL :     If he took it, if we give him everything.

HICKS:     Right.

VEAL:      Yeah, but, you know.

HICKS:     You not playin'.

VEAL:      Yeah.

HICKS:     Not too good of a deal. Plus, I wouldn't really mind if, ah, if (UI) typically leave a ki. That way the guy be like, "At least I can start some." (UI).

24

VEAL:      Ah, leave a ki there for the guy that, that motherfucker go plenty of money, man. Shit, he doesn't want that little money. Yeah, shit. Don't be leavin' shit.

## First December 21, 2000 Video-Recorded Meeting

On December 21, 2000, HICKS had a video-recorded meeting with Veal at Veal's office. During this meeting, Veal, at the direction of the FBI, supplied HICKS with the address of the purported drug stash house on West 58th Street and the name and identifiers of the purported drug dealer (Antoine Dickinson) who maintained the stash apartment, so this information could be put in a false and forged search warrant—which, in fact, is what happened. This conversation included the following:

VEAL:      Oh, shit. Don't be late. (UI) around here by that boy.

HICKS:     Yeah, that shouldn't be a problem. You gonna be here?

VEAL:      Yeah. Here we got. Antwan Dickson...you ever hear of him? That's the name anyway. Okay, 3019 West 58th Street, second floor apartment on the right. He said on the right side of stairs. He's said on the door there's three cartoon characters (UI) on the door.

HICKS:     Mmm mmm.

VEAL:      Cause I don't want you to hit the wrong goddamn house...because then got big problems, okay.

HICKS:     Right. Yeah.

VEAL :     Okay, now he said this morning he dropped off $250,000. And there's three or four ki's there. But it's more than $250,000...you got to look up underneath the couch, should be, I said don't miss the money. Now 250,000 taped to the couch. But say there's a tin can in the dining room (UI) he say, there some money, there's some hundred dollar bills and some shit. Then, on the building it says 3017, 3019. So you go upstairs on the, uh, second floor and to the, the right hand side. Shouldn't be able to miss the motherfucker.

HICKS:      (UI) Is he, uh, gonna be there?

VEAL :      Oh, he [referring to the "young guy"] jammed the door. The second door you go in. You got to get buzzed in. So he jammed the door so you just can come up in there. He said this dude [Antwan Dickson, the purported drug dealer whose stash apartment it was] is there with him now, but they been going in and out. So he said whether he's there or not, go in there. Because you know where the money's at. You just...you leave a search warrant so he'll know it wasn't his people who came through there.

HICKS:      We can't leave the search warrant because he might call and say his house was hit or something.

VEAL :      Who he gonna call?

HICKS:      (LAUGHS) That's true.

VEAL :      He can't call the police. Shit (UI) there. But this dude, the other dude is trying to protect himself because he don't want it to look like he had any knowledge. Because see this guy know he just brought that money up there now.

HICKS:      Yeah. What does he look like?

VEAL :      Oh, this dude here is about maybe 42, 43, 5'10, dark skin dude.

HICKS:      Kinda' older dude?

VEAL :      Yeah. Yeah.

HICKS:      Write it down. (UI). What time they suppose to be?

VEAL :      They there now. He say do it now. Shit. What time do you figure? You gonna come back here or what? Come...Oh, now he said there's three or four ki's of (UI) cocaine there. But what you want to do with that?

HICKS:      Yeah.

VEAL:       You want to give that to him? (UI) that money (UI).

HICKS:    Yeah, that's true.

VEAL:     Alright, give it to him. We ain't got to give him anymore money.

HICKS:    Well, there (UI) 1000,000 (UI).

                    * * * *

VEAL:     That's why I was wondering with the time, if we had enough time to get a search warrant, 'cause I thought he did that shit at work, ya know.

HICKS:    Yeah, well, it's gonna be tight getting over there. That's a long way to go. On these streets now. 'Cause as long as he's there, that's the main thing.

                    * * * *

HICKS:    And your boy's okay. I don't have to worry about. I don't have to worry about police sittin' in there when we walk out and shit.

VEAL:     He ain't do shit. That motherfucker trying to see what he gonna get. Especially if it ain't right (UI) on the dope. I say this ain't operatin' (UI) Christmas shoppin', man

HICKS:    That's right 'cause it's too late to worry about that shit.

VEAL:     Right.

HICKS:    Well, we'll see with all four ki's. Four or five ki's and shit. That 100 grand

VEAL:     That's 100 grand, yeah.

HICKS:    Right. Right. That's all, there we might have to renegotiate.

VEAL:     (UI)

HICKS:    And he still got to sell them, too.

VEAL:     Yeah. But we'll see how much money we got. That's why I say, say now check in the dining room...there's a tin can...check that good, because it's money there. Now another thing. I want you to do what you got to

                         27

do as quick as possible 'cause I don't want nobody else to unjam that door. I guess they (UI) you know, (UI) that door. So if one of those other tenants come in and they be fucking around, jamming the door, so...

HICKS:      Yeah, we not too worried about the door. We just don't want to have a problem coming out that motherfucker.

VEAL:       Shit, tenants can't say shit about that.

HICKS:      I'm talking about the police. Like this motherfucker being a Fed.    (UI) say no way, uh?

VEAL :      Naw.

HICKS:      Alright, I'll give you a call.

## December 21, 2000 Raid of West 58th Street Apartment

HICKS relayed the information which he had obtained from Veal – the street address of the apartment to be searched and the name and physical description of purported occupant of the apartment – to Moran, who put this information in a false and forged search warrant.

On the evening of December 21, 2000, Moran and Knitter unlawfully entered and searched the West 58th Street apartment, and stole $3,000 of what they believed to be drug money, but what was actually FBI undercover funds. This search was captured on video pursuant to a court order. Later, HICKS, Moran, and Knitter divided this cash among themselves. Moran and Knitter failed to find another $7,000 in purported drug money which the FBI had been placed in the apartment.

**Second December 21, 2000 Video-Recorded Meeting**

Later in the evening on December 21, 2000, after the raid of the West 58th Street apartment, HICKS met with Veal at Veal's office where they discussed, among other things, the relatively small amount of cash that was found at the apartment. This meeting was video-recorded:

VEAL:       (UI) Damn man, I'm tellin' you, I was wonderin' what happened to you.

HICKS:      That's the problem, nothin'.

VEAL:       What? It ain't go?

HICKS:      We got over there, yeah. We went over there, they weren't there. They broke the door down, he had $1,500 bucks [actually $3,000] or something there.

VEAL:       They look at all the places? I'm gonna have to page this guy and get in touch with him and see what's up with him. Damn.

HICKS:      See, it was only a couch and some other stuff in there.

* * * *

VEAL:       Yeah. Did they look in the couch, in the cans, all this other shit? I may have to contact him and see what happened with that shit. You didn't leave no warrant, did you?

HICKS:      I don't think they did.

* * * *

VEAL:       Aw, I'm gonna reach out, to them tomorrow. Matter of fact, I'm not gonna reach out. Naw, I'm gonna see him tomorrow. I'm gonna see what's happening, man, cause, shit, the money (UI) still here. You, would you guys be ready to go if we find where the money's at?

HICKS:      Well, Friday, ah, one guy say Friday is a bad day. Shit for that kind of money he just gotta make it a bad fuckin' day (UI).

29

VEAL:       Well, let's see what happened, shit.

HICKS:      And, um...

VEAL:       Man, I already spent some of that fuckin' money.

HICKS:      Yeah, well there's no doubt that everybody was lookin' forward to a Merry Christmas.

                                    * * * *

VEAL:       Damn, Eddie, I had spent that money babe. Shit.

HICKS:      Believe me, I visions of driving that red vet.

VEAL:       Shit.

HICKS:      I said this shit's gonna work out. Cause your deals are usually always, uh...

VEAL:       Yeah, they usually be solid cause this guy is reliable.

HICKS:      Yeah, well he wasn't as reliable as we thought.

                                    * * * *

HICKS:      . . .cause I know they say wasn't shit in there. So, therefore, it's definitely that kinda place.

VEAL:       Right, right, right, right.

HICKS:      Cause it didn't take them too long.

VEAL:       So they may have picked up that money and took it somewhere. If he did, he may know where he took it.

HICKS:      That's true.

**First December 22, 2000 Recorded Telephone Call**

The next day, December 22, 2000, Veal and Moran had a recorded telephone call. During this call, Veal, as part of the undercover scenario, explained that he had found out from the "young guy" that Moran and Knitter had failed to find a large quantity of drug money which had been hidden in the garbage can at the West 58th Street apartment:

MORAN:      Where was it?

VEAL:       In the garbage can.

MORAN:      On the back porch.

VEAL:       No, in the house there.

MORAN:      No, no, it wasn't, it wasn't that one.

VEAL:       No, he said he had to dump it out.

MORAN:      Oh.

VEAL:       Yep, he said he had to dump it out.   If you dumped it, there was three hundred and fifty thousand there.

                                    * * * *

VEAL:       It couldn't of been. It was a little bitty garbage can. I'm telling ya. I looked in the thing.

VEAL:       Oh, well he said in the garbage can. That's where (UI). Maybe...

MORAN:      (UI) on the porch. On the back porch it coulda been.

VEAL:       Maybe it was on the back porch.

MORAN:      That's what, that's what scared me. Cause I didn't look on the back porch.

31

* * * *

VEAL:      So they trying to find a, a different spot, so. Well how many guys in there searching?

MORAN:     Just the three of us.

VEAL:      Three in there searching?

MORAN:     Yeah, but you know we, we didn't go in (UI) ah, fuck. See normally Eddie [HICKS] covers the back. You know what I mean?

VEAL:      Yeah.

MORAN:     And I've, I've never covered the back in my life to be honest with ya.

**Second December 22, 2000 Recorded Telephone Call**

Later in the day on December 22, 2000, Veal and HICKS had a recorded telephone call during which they discussed the money which Moran and Knitter had missed during the raid of the West 58th Street apartment.

VEAL:      Oh, okay. I met with my guy ["the young guy"] this mornin'. Man, you'd never guess what happen. You, who did the searchin.

HICKS:     They did.

VEAL:      Okay. They left 350 in the garbage can.

HICKS:     Oh, man.

VEAL:      Yep, in the garbage can. When they got back they saw that, you know, somebody broke in the place...

HICKS:     Mm hmm.

VEAL :     ..and once they saw that, you know, they assumed it was some thugs or something. So they just, you know, uh, gathered up everything. And my guy was just knowin' the 350 was gone. They turned the garbage can

32

over another 350 is in there. They said to the other guy, man, good they didn't find this.

HICKS:        Mm hmm.

VEAL:         That was, they didn't search worth a shit man. Matt supposed to know better then that. Now that's shit.

HICKS:        That's true and I didn't go in with him.

* * * *

VEAL:         Yeah, we gonna have to try to do somethin' else, you know. But, um, this guy, now that spot, he don't want, you know, he, he scared of that spot now.

HICKS:        I would imagine (UI).

VEAL:         Yeah, so, he's moving to another spot. You know, th-th-a matter of fact they supposed to be doin' that this mornin', trying to find another space to line up. But, you know, he don't know that, nothin' like that yet. But, um, that was 350 we just let get down the drain, shit. So. Uh, call him back and give him a reprimand on that shit, man. Shit. (LAUGHS)

HICKS :       Yeah, boy, these guys. I don't understand. (LAUGHS)

VEAL:         Yeah, hell, you know you're supposed to get in the garbage can. You're supposed to dump the garbage can out. Shit.

HICKS;        Yeah.

VEAL:         That's the first place everybody put stuff in the garbage.

HICKS:        Yeah.

VEAL:         Shit, so. Okay. I'll holler at you later. I'll, I'm gonna try, you know, to see when the next thing is that he gets lined up for us. But, tell Matt, [Moran] man, that ain't the way the deal go, man.

HICKS:        Yeah, well it would be nice if, uh, they were riding around with it.

33

(m)   West 67th Street Undercover Apartment

## January 26, 2001 Video-Recorded Meeting

On January 26, 2001, HICKS had a recorded meeting with Veal at Veal's office. As part of the undercover scenario, Veal told HICKS that the original drug dealer (Antoine Dickinson) had relocated his supply of narcotics and drug money to a different apartment located on West 67th Street (which was also an FBI undercover apartment), and that this apartment was under the name of "Ricardo Rodriquez." Law enforcement later recovered two fake search warrants—in the names "Antoine Dickson" and "Ricardo Rodriguez"—from Moran's residence. Also during this recorded meeting, HICKS discussed with Veal how the crew could go about stealing the a multi-million dollar quantity of money from a tractor-trailer which was being used by cocaine organization connected to Leroy Elam to transport drug money from Chicago to Texas. *See* subparagraph (i) on page 16 above.

VEAL:      Okay, my guy he came by this morning. I got his address and everything. And he said...

HICKS:     Oh, fuck.

VEAL:      That's why I paged ya.

HICKS:     Well, this is nothing. This is about the fifth page I got since I spoke to you but, I mean, only one from Matt. I mean only, one from that. And I'm like man these motherfucker whores (UI).

\* \* \* \*

VEAL:      Okay, now he said ah it should be three ki's of coke he say last night. And the guy was supposed to put it under the sink. You want those too. Okay 'cause he ha...

34

HICKS:     (UI) the sink.

VEAL:      Under the sink.

HICKS:     Oh, okay.

VEAL:      You know, he, I guess he taped 'em under there, or something. You know, (UI) so make sure you check and get them motherfuckers. Ah, he couldn't tell me what (UI) he got 'cause called and started being (UI) little paranoid now. So he just had his money so you're just gonna go there and do a thorough search.

HICKS:     Um-hum.

VEAL:      Okay?

HICKS:     Probably get another situation nobody's gonna be home, man.

VEAL:      He don't know. He said this guy might be there, and he might not be there.

HICKS:     Did he tell ya what kind of car he got?

VEAL:      Na, gave his name. He's a Mexican dude.

HICKS:     Mexican dude?!

VEAL:      Yeah.

HICKS:     So this is a different guy then, huh?

VEAL:      Well, Rodriguez. That's why I say Mexican. Richie Rodriguez.

HICKS:     But that wasn't the name of the first one.

VEAL:      That wasn't the name of the first one, no. No, you know what? This is the name who apartment it's in.

HICKS:     Um-hum.

VEAL:      So you know what, this is name of the apartment is. This name (UI) he
           said he just got this place a couple days ago. So, I guess they just (UI)
           it's 3134 West 67th Street. Is that Mexican over there?

HICKS:     Yeah.

VEAL:      Okay, that's why he had a Mexican name. Okay, but you know what
           the brother look like, the one dude I'm talking about? (UI) older guy.

HICKS:     Yeah, in his forties.

VEAL:      Yeah, okay.

HICKS:     About 5'9" I guess, 5'10".

VEAL:      If he there then, you leave paperwork, you know. So if he ain't there,
           you know what to do.

HICKS:     (UI) Don't leave shit then. (UI).

VEAL:      Right.

HICKS:     He'll just know the police came in.

VEAL:      Right.

HICKS:     'Cause Richie Sanchez is probably a bullshit name.

VEAL:      No, I just (UI) that's Richard...

HICKS:     Rodriguez.

VEAL:      Rodriguez?

HICKS:     (UI).

VEAL:      Yeah, yeah.

HICKS:     You say Rodriguez, I say Sanchez 'cause that's the guy I know.

VEAL:      Oh.

HICKS:      I mean, I want a description on Sanchez. What is this diagram we got
            here?

VEAL:       (UI) shit he told us about this (UI) ah that's 67th Street, that's Kedzie.
            That's the alley. Okay this is from...

HICKS:      Troy and Kedzie, right?

VEAL:       Troy and Kedzie, right. Iron gate. I said will there be any problem
            getting upstairs? And he said no. He said they'll be open (UI) time.
            Sometimes you can go in this way (UI) that way.

HICKS:      Well, this is a alley so it must go (UI).

VEAL:       Can't get up there that way. Probably courtyard building (UI).

HICKS:      Yeah.

VEAL:       So.

HICKS:      And you're saying (UI).

VEAL:       Okay, 3130 is to the right. Okay, shit okay. Second floor.

HICKS:      Well, shit, gotta be there 'cause, shit, third time he'd thinking, well,
            what the fuck.

VEAL:       (UI).

HICKS:      (UI).

VEAL:       (UI) taking that motherfucker up there with us, he gonna find the
            money hisself. Fuck.

HICKS:      (LAUGHS) Yeah.

VEAL:       Yeah, but...and make sure everybody do a, you know, do it
            thoroughly...so we don't miss shit, man.

HICKS:      Did he say what, ah, how much this time?

VEAL:       Should be over two hundred.

HICKS:      Oh, fuck.

VEAL:       So.

HICKS:      And that's a drop, huh?

VEAL:       Yeah, yeah.

HICKS:      (UI).

VEAL:       (UI) take a chance that they'll go get that you know and...

HICKS:      Right.

VEAL:       Because this other deal we gonna do in two weeks, it's set.

HICKS:      Oh okay.

VEAL:       Yeah that's, that's a go there, so. He said he know they'll be finished
            with they money and everything in a couple weeks. And he's the one
            that's doing the driving...the guy who was here last night. So he say
            just, ah, he said and he ain't gonna let us miss him if he had to come
            get it, 'cause he get his share.

HICKS:      Right.

VEAL:       You know so.

HICKS:      Well, shit. That's enough ah...

VEAL:       (UI).

HICKS:      (UI) eight million or five million, he'd be straight for life.

VEAL:       He said it'd be right up under ten probably...is what we gonna have so.

HICKS:      (UI) plus we'll have, ah, just a little paperwork then.

VEAL:       Yeah, (UI) the paperwork. He, he ain't scared. He, he said he needs
            some money, shit.

HICKS:     Well, he's smarter than most.

                      * * *

HICKS:     He give any specific time or fuck it, whatever (UI).

VEAL:      He said ah (UI) he said, he said, nah, (UI) you're talking about doin'
           something at night, go ahead and do it.

HICKS:     Yeah.

VEAL:      You know, so.

HICKS:     Well, it'll be dark in about a half an hour.

VEAL:      Right. You wanna do it in the dark, yeah, you know.

HICKS:     Traffic won't be so fucked up. And sometimes that's a plus, too. But
           shit, I hate to go when these motherfuckers just hit the street, they so
           fired up, you know.

VEAL:      Yeah, right, right, right, right, right, right, right. And I'm gonna hang
           around here so.

                      * * *

HICKS:     Well, the only thing is this guy is, what's his name is driving the truck.

VEAL:      Who?

HICKS:     Leroy's driver

VEAL:      Yeah (UI).

HICKS:     Well, I need his name. You know, so I'll make out the paperwork

VEAL:      Okay.

HICKS:     'Cause I need it before the day 'cause I wanna have...

VEAL:      Right, you wanna get (UI) well he ain't (UI) no problem.

                      39

HICKS:     Right. And only thing I need, uhm, if he knows the exact date, like 16...earlier he knows the exact date.

VEAL:     Um-hum.

HICKS:     'Cause I can't say it happened on the 17th and it happened on the 16th.

VEAL:     Right, right.

HICKS:     You know what I mean?

VEAL:     Well, I figure, okay it won't happen like next week but that following week, so I figure maybe by Thursday, Friday of next week, he'll know everything. So, we'll have everything, we'll have a couple days to work with everything.

HICKS:     Right.

VEAL:     You know, so.

HICKS:     'Cause I like to ah, you know I gotta fix the paper up so it's just, certain parts you could read and certain parts you can't read.

VEAL:     Uh-huh.

HICKS:     So I need to, ah, you know, so we get that straight. That way when I, ah, do the paperwork up and, you know, and make the copies, you know, some shit we fake but...

VEAL:     Um-hum.

HICKS:     (UI).

VEAL:     (UI) something happened, yeah.

HICKS:     Like his name and weight, or whatever.

VEAL:     Uh-huh.

HICKS:      And stuff like that, you know. Plus we probably been there, huh. Uhm (UI) the cash so we say, yeah, the motherfucker stole something out of there. You know what I mean.

VEAL:       Um-hum, um-hum, um-hum.

HICKS:      'Cause they figure you're gonna take some of it.

VEAL:       Right, right. You're gonna steal something, 'cause you know, right.

HICKS:      That's the way of the world.

VEAL:       Right, he said he, he, he, man he (UI) he said he ain't worried about none of that shit.

HICKS:      (UI).

VEAL:       Because, ah he, he tried, he want, he want something to happen so bad, you know. You know that's why he's arranging it. Get the shit (UI) got nice shit I'm waiting. And then the last time I go, ah, maybe (UI) should wait till it build up (UI). No let's get this now because he might not let it build up you know.

HICKS:      (UI) he figure his shit just gonna be the same no matter what happens.

VEAL:       Right, and he know, like he say he saw the dope under there last night. So he gonna get that now while it's there, 'cause it might be sold this weekend.

HICKS:      Right, yeah.

VEAL:       So.

HICKS:      Yeah, like I say he's figuring on something. His shit gonna be the same no matter whether it's three hundred or the two hundred (UI).

VEAL:       Right, right. He got the ki's anyway, yeah, yeah. Yeah.


HICKS:      Well, guess I can use the bathroom. Getting ready to drive down here. Deal with, ah, these guys. Everybody on...well, other than that Matt, 'cause he knows.

VEAL:     Um-hum.

HICKS:    (UI) they be having long faces then, a couple of weeks (UI) obviously (UI) we gonna be putting' them into all that shit...give 'em, ah, something.

VEAL:     Yeah, we'll work this (UI) between me and you (UI).

HICKS:    Right. Ye...yeah. But you gotta give...

VEAL:     (UI) something, yeah.

HICKS:    But you gotta give, include (UI) something, but they won't be...

VEAL:     Yeah.

HICKS:    ...equal partners.

VEAL:     Right, right.

HICKS:    You...who's it gonna be...it me, you...

VEAL:     Matt.

HICKS:    Matt and the driver.

VEAL:     Well, and you got another guy with you, ain't you?

HICKS:    Right.

VEAL:     Okay. So it's, ah, ah, five of us.

HICKS:    Right. But really we don't need to use the other guy...he's driving the truck. Is somebody gonna be in the truck with him?

VEAL:     Well, you know what. You don't really need another guy there. (UI).

HICKS:    Right. So we just, you know, the two guys ah (UI) what they ah...

VEAL:     Right, right. Yeah, 'cause...

HICKS:      (UI).

VEAL:       (UI) but you right.

HICKS:      Right.

VEAL:       You don't you know. But you cut 'em in, 'cause (UI) goin' on this other shit, so.

HICKS:      Right. And ah, it's keeps everybody happy, too, you know, because...

VEAL:       You (UI) save five hundred a piece.

HICKS:      Um-hum.

VEAL:       You know on shit. They'd be happy like a motherfucker with that.

HICKS:      Well, that's true. That would be retirement shit for them.

VEAL:       Yeah.

HICKS:      And the other guy who, ah, retired and went down to Vegas...shoot, I still give, you know, give him something.

VEAL:       Right, 'cause (UI).

HICKS:      Well, well, he was there when times were tough.

VEAL:       Right, right.

HICKS:      And when you get that kind of money, shit, what the fuck. Give a guy a hundred grand like that's gonna...

VEAL:       And that's why he (UI).

            (LAUGHTER)

HICKS:      If he, if he's really up (UI) yeah.

VEAL:       Right, yeah.

HICKS:      Well, shit, if...well he should know what it's gonna be.

43

VEAL:     Ah, he know what it's gonna be, he'll know exactly, everything. 'Cause they tell him the numbers and everything damn thing.

HICKS:    Okay.

VEAL:     Yeah, so you know what he can't get...

HICKS:    So they already told him about ten

VEAL:     Uh-huh (UI). It'll be ten or better.

HICKS:    This just be a little appetizer, till...

VEAL:     Till we get, right till we get to the deal.

          (BACKGROUND NOISE)

          (UI)

HICKS:    Well, I'll get this show on the road. So (UI) about, about ten o'clock we should all be, fuck no (UI).

VEAL:     Right.

HICKS:    Like you say, we should (UI) that's the kind of shit though. I don't worry about this shit, but I don't wanna kill anybody over no bullshit either.

VEAL:     Right.

HICKS:    Now when you say oh you know it's five million dollars, then you can kill somebody. But when you talking about a few thousand dollars...

VEAL:     Yeah, I (UI) this shit. You never know how much it's gonna be either, 'cause (UI) so.

HICKS:    Well, it might be a good deal, but shit, if it's a good deal (UI).

                    * * * *

VEAL:       Hollar back at you later on this evening.

HICKS:      I got your cell phone.

VEAL:       Right.

HICKS:      And if you ah (UI). I don't know, don't take four hours or so.

VEAL:       Yeah, that's alright (UI) I got nothing to do at home tonight.

HICKS:      Still be sitting here (UI).

VEAL:       Okay, (UI).

HICKS:      Sure.

VEAL:       Well thank you (UI) if I do leave I, you know, I'll be in the area.

HICKS:      Well, if I call here and nobody answers, then I'll call over on the cell phone.

VEAL:       There ya go. Alright (UI).

HICKS:      Okay.

(BACKGROUND NOISE)

HICKS:      Do you remember that guy's name? In case Matt forgot.

VEAL:       Who, which one?

HICKS:      The guy that works for him. The head guy.

VEAL:       Damn man.

HICKS:      That's all right. I'll get it. (UI) I tell him to destroy that shit every time.

VEAL:       Yeah, right, okay. Well...

HICKS:      Fuck it.

VEAL:      Yeah, put anybody's name on that motherfucker, shit.

### January 31, 2001 Video-Recorded Meeting

On January 31, 2001, HICKS met with Veal at Veal's office to resume planning to raid the West 67th Street apartment, which had not taken place as expected on January 26th.   This meeting was video-recorded.

VEAL:      Okay, we're all set again. Shit.

HICKS:      How much he suppose to have this time?

VEAL:      He said he was gonna be over at three, so. (UI) uh.

* * * *

VEAL:      No, he's got it...it's in the house.

HICKS:      In the apartment, 2B (UI).

VEAL:      Yeah.

HICKS:      Yeah.

VEAL:      So.

HICKS:      Check everything. Back porch, second floor, third floor.

VEAL:      Just make sure we get the money.

HICKS:      (UI) basement. Gonna have the shit in the place. How many ki's suppose to be there?

VEAL:      I think that the main guy the only one guy who got a key. Cause he (UI) have that last deal. So, I don't think like everybody got no key. You know?

HICKS:      No, I mean like ki's in dope.

VEAL:      Oh. Ah, it should be three to five.

HICKS:          Oh, shit. He'll really be flying high.

VEAL:           Cause he'll be straight. Yeah, that's where he gonna get his money.   Ya
                know, (UI).

                                    * * * *

HICKS:          Hum, the Tribune gonna be trying to take over every-fucking-thing.
                Well, let me see. Get this deal outta the way tonight, and hopefully he'll
                have (UI) four hundred instead of...

VEAL:           It'd be nice, shit.

HICKS:          Yeah, especially if he got the dope so we don't even have to worry about
                you, your guy.

VEAL:           Yeah.

HICKS:          So, I think it was three ki's, he'd be happy.

VEAL:           He be, he get the dope. He straight, shit.

HICKS:          Yeah we'd be happy to give him the dope.

VEAL:           Mm hmm.

HICKS:          Unless it's ten ki's.

VEAL:           Then that's create...that's put a different spin on it. Yeah.

### January 31, 2001 Recorded Telephone Conversations

Later in the day on January 31, 2001, HICKS had five recorded telephone

conversations with Veal, which occurred before, during, and after the raid of the West

67th Street apartment. As noted above, on the evening of January 31, 2001, Moran,

Knitter, and another individual, Albert Fontana, unlawfully entered the West 67th

Street apartment, searched for cocaine and money, and stole two bundles of cash

47

totaling $10,000. This search was captured on video based on a court-authorized interception. While Moran, Knitter, and Fontana were inside the West 67th Street apartment, HICKS spoke to Knitter via cellular telephone to get updates on the search for the cocaine and money.

### First Recorded Telephone Conversation on January 31, 2001

VEAL:      Hey, what's up? Okay I just talked to my guy. Just got off the phone with him. Him and the guy fittin' to go out now cause they had bought a new refrigerator fittin' to go restock it now I guess. Ah, make sure you look under the sinks and shit, okay.

HICKS:     Yeah.

VEAL:      So, it ain't a lot of stuff in there so, ah, he said do the sink, the cabinets so, he say it shouldn't be difficult, okay?

HICKS:     Right, hopefully they'll be gone because we're waiting for our guy right now.

VEAL:      Okay, well they, he, ain't nobody at the place now, they gone. Cause he said he was going shopping. So just go do what you gotta do then you know get the fuck on up out by there.

HICKS:     Right they might be back but we'll, whatever happens, (UI) no problem.

### Second Recorded Telephone Conversation on January 31, 2001

HICKS:     Yeah, what's happenin'?

VEAL:      Oh, I was gonna tell you now. I don't know if wrote on that paper or not, that, that's the second floor, 2B.

HICKS:     Right.

VEAL:      Okay. Now he said there should be five of them ki's of, of thing there, okay.

HICKS:     Okay.

48

VEAL:       So don't, don't miss 'em.

HICKS:      (LAUGHS)

VEAL:       Shit.

HICKS:      He had about three, right?

VEAL:       Right, right.

HICKS:      Okay.

VEAL:       For him, three.

HICKS:      Yeah cause it'll be light.

VEAL:       Okay?

HICKS:      Yeah.

### Third Recorded Telephone Conversation on January 31, 2001

HICKS:      Little bundles. And that was it. None of that five stuff. And none of that other thing.

VEAL:       They look under the sink and everything?

HICKS:      They said they still looking 30-40 minutes worth, but I'll double check.

VEAL:       Okay. Make sure they do a thorough search now.

HICKS:      They are. Okay.

VEAL:       Alright. Call and let me know.

HICKS:      Alright.

VEAL:       Alright.

### Fourth Recorded Telephone Conversation on January 31, 2001

HICKS:      Yeah, you suppose to be there. But uhm...

VEAL:       They look all in the refriger...I know he looked in the refrigerator and shit.

HICKS:      Yeah, that's where they found one of 'em of in the refrigerator and one under the sink. But, uh...

VEAL:       How much dope? Did they get any dope?

HICKS:      No.

VEAL:       Damn.

HICKS:      They still in there.

VEAL:       I don't...I don't... Do you think I should reach out for the guy {"the young kid") or not or what?   What do you think?

HICKS:      Uh, well, I guess you can page and see what he got to say.   But he can't say much but shit if he say anything. But that be better than nothing.

### Fifth Recorded Telephone Conversation on January 31, 2001

HICKS:      Yeah.

VEAL:       Okay, I just talked to him ("the young kid"). Gone to Minnesota. The boss came there and got the money. He said that's why he couldn't call me, because that son of a bitch was keeping it right with him.

HICKS:      Mm hm.

VEAL:       So he got the money. He going to Minnesota with it. I told him the next one we do. We're gonna have to get him in his car. I ain't doing this house shit no more.

HICKS:      Yeah, this has gottin' out of control.

VEAL:       Right. Right. This is crazy here, so...

HICKS:      Okay.

VEAL:       The next one we do, we gonna, he's known, he gonna have it in the trunk.

HICKS:      Yeah.

VEAL:       Okay. Well, you want to meet tonight or tomorrow?

HICKS:      Well, I don't know, I was gonna shoot out there tonight. I guess we can shoot out there tonight and get this shit over with.

VEAL:       Okay, 'cause...

HICKS:      Even though it won't be near shit.

## Second January 31, 2001 Video-Recorded Meeting

After the raid of the West 67th Street apartment, HICKS and Moran traveled to Veal's office and met with the Veal. During this meeting, HICKS paid $995 in cash to Veal consisting of bills, which had been stolen from the West 67th Street apartment. HICKS paid this money in exchange for the Veal's assistance in providing information on the robbery target. This meeting was video-recorded:

VEAL:       Man, what's up? What the hell's going on, man? Why can't we get this money?

MORAN:      Don't worry. Like I told him. I said hey...listen, because we're on the phone. I said, man, we've searched here and we've searched there. Keep tryin'. Okay, we're gonna (UI) done like, shit on TV.

VEAL:       This guy is a step ahead of us, though. That's the problem.

MORAN:      I said what now. He said go down and see about the garbage can. I was on the porch. Ain't no garbage can. (UI) Go inside them lockers. I said, well, we open them lockers. (UI) Dump that in the ground. (UI) I mean, ya know, I said we can get it right. (UI).

VEAL:      But then when I called him, he did say the guy came by and picked the shit up.

MORAN:     What...hey, like I told him, hey, how many times do they want?

VEAL:      Yeah.   Yeah.

* * * *

MORAN:     We need to catch him in a car.

VEAL:      Right. That's what I'm saying.

MORAN:     A street stop. 'Cause actually, with him in the house anyway, (UI) gonna hurt your guy.

VEAL:      Yeah. Yeah.

MORAN:     Your guy is in danger.

VEAL:      Cause he's gonna figure the guy set him up, too.

MORAN:     (UI) Why we keep showing up all the time.

VEAL:      Right. Right.

MORAN:     I told him. I said, man, I said I'm sorry. This is the closest we've come to not getting something. I'm here on the phone. Before you start, this is what we've done so far.

VEAL:      Yeah.

MORAN:     I said the false ceiling every motherfuckin' panel has been turned over in the false ceiling.

VEAL:      So you looked everywhere?

MORAN:     Oh, yeah. He was on the phone.

HICKS:     I wish he would have called before they take the whole fucking place.

MORAN:     We tore up the whole fucking house. But now I wish we hadn't done that, because now he's gonna wonder.

* * * *

HICKS:     Well, we can't keep hitting 'em (UI) this anymore.

VEAL:      Can't keep doing it. Right. Right. So I say we ain't hittin' no houses no more. He might fuck this up, and, son of a bitch, we'll die.

HICKS:     Yeah.

VEAL:      Because this is the second time this month, and he only got to be kind of...in the vicinity when this shit happen.

MORAN:     He best be careful. And watch yourself, too, 'cause he might tell.

VEAL:      He ain't gonna tell.

HICKS:     Well, if he tells, he's fucked, cause then they're gonna kill him.

VEAL:      Right, 'cause that'll mean he was in on it.

HICKS:     Yeah.

* * * *

VEAL:      (UI).   (ANSWERS TELEPHONE) Hello, man [pretending to talk to the "young guy"]. We just discussing what the hell happen. You with the guy now? Oh, okay. Okay. I told you I was waiting for some bitches or something, man. That was no money to work with. Shit, you know. You know I was saying I think he get where he don't trust you no more. He ain't letting you know where everything is at, you know what I mean? We're just talking...the next thing we do is gonna have to be in his car. We ain't fucking with them houses no more. Yeah, he gettin' paranoid, that's all. Yeah, so. Yeah, yeah, he said...he gonna pissed again, cause I think is door is knocked off, so burglars done got him again. I don't know what you're tellin' this guy. Shit.

HICKS:     Don't tell him shit.

VEAL:      Yeah. I know you was trying to cover the bases, but the guy is just getting paranoid. You just go to look at it that way. But if we fuck with him again, make sure he's got the money in the car, cause we ain't fucking with him and that house shit. Okay, alright. Yeah...okay. Right. Can't blame you this time. Shit, this guy just paranoid man..so, and he (UI) about that, too, you know, so, yeah.

HICKS:     Tell him at least he thinks its burglars. He don't think it's the police.

VEAL:      Yeah, uh huh. Okay, talk to you later. (END OF TELEPHONE CALL) Hello. He all apologetic, man. He's like I ain't trying to fuck you around, man. He said this motherfucker, jumping his money all around and shit.

MORAN:     (UI).

HICKS:     Well, that makes sense.

* * * *

HICKS:     Yeah, okay. I was kinda looking forward to a better hit than this.

VEAL:      Yeah, shit. I figured like you say this motherfucker. He don't trust this guy I'm fucking with now, man. I can tell that now.

HICKS:     Well, you still got to think that this is still his guy.

VEAL:      He still hang with him. (UI). He, he a money raiser for him.

HICKS:     Yeah.

VEAL:      So he still fucking with it.

HICKS:     (UI).

VEAL:      I know next one gotta be a car. Something simple and easy. We've got to know the car, know what's in the truck. Fuck all this other bullshit.

HICKS:     Well, plus if you pull 'em over and you in a police car, they just gonna say fuck it, (UI) the motherfucker.

VEAL:      Yeah.

54

HICKS:     Cause police stop motherfuckers all the time.

VEAL:      Then he gotta think he gonna lose money anyway. And if he's got some dope, you really ain't gonna have a problem with him, shit.

HICKS:     Well...we shall see.

VEAL:      My boy, he as fucked up, cause he wanted those ki's you know.

HICKS:     Well, at least, well...

VEAL:      See, I think what he's trying to do. He's trying to get out on his own. Ya know, break loose from this guy he working with.

HICKS:     Which would make sense.

The FBI arrested HICKS, Moran, and Knitter the next day, February 1, 2001.

The original indictment in this case was returned against HICKS, Hargrove, Knitter, and Moran in November 2001. HICKS was set to stand trial before Judge Wayne Andersen on June 9, 2003 and he appeared at the final status hearing before Judge Andersen on May 29, 2003. HICKS failed to appear to stand trial on June 9, 2003. After fleeing Chicago, HICKS fraudulently obtained a State of Michigan driver's license in the name of David Rose, and was a fugitive from justice for approximately the next fourteen years – until September 2017 when we was apprehended in Detroit.

## V.    SUMMARY OF COCONSPIRATOR STATEMENTS

As demonstrated above, the statements between coconspirators made in the furtherance of the charged conspiracies which the government intends to introduce at trial fall within the following categories, all concerning subjects that were integral to the charged conspiracies: (1) statements by Moran and Hargrove, as recounted by Knitter, concerning the planning and execution of the charged conspiracies; (2)   statements by Hargrove, Moran, and Knitter to conceal the conspiracies from the Alsip police officers who responded to the attempted robbery at the Alsip apartment in April 1999; and (3) statements made by Moran during audio- and video-recorded conversations with Veal concerning the planning and execution of the raids of   the two undercover apartments. All such statements made by conspirators Moran and Hargrove were in furtherance of the conspiracies. Under the case law summarized above, all these statements are properly admissible as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

HICKS's own statements as recounted by Knitter and the Alsip police officers or captured in the recorded conversations are admissible against HICKS as opposing party statements under Fed. R. Evid. 801 (d)(2)(A).[5]

___

[5] The statements of Arthur Veal on the recordings will not be offered for their truth, but only to provide context to make the admissible statements by other speakers intelligible. *See United States v. Wright,* 722 F.3d 1064, 1067-69 (7th Cir. 2013)("[I]t is difficult to imagine how the CI's statements independently establish any fact relevant to [the defendant's] guilt . . . [T]he CI's only factual assertion was that some 'guy' was asking the CI for drugs, but that testimony was not offered to show that some "guy" actually wanted drugs from the CI – the assertion was plainly being offered as a ruse, which led to [the defendant's] key admissions.").

## VI.   CONCLUSION

The government respectfully requests that this Court find, based upon this proffer, that the kinds of statements described herein are conditionally admitted as coconspirator statements under Fed. R. Evid. 801(d)(2) and Seventh Circuit precedent.


Dated: January 9, 2019       Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney


BY:    *s/ Morris Pasqual*
MORRIS PASQUAL
GRAYSON SANG WALKER
Assistant United States Attorneys
219 S. Dearborn Street, Suite 500
Chicago, Illinois 60604
(312) 353-5300

**CERTIFICATE OF SERVICE**

I, Grayson Sang Walker, hereby certify that on January 9, 2019, I electronically filed the foregoing **MOTION TO ADMIT EVIDENCE PURSUANT TO FED. R. EVID. 801(d)(2)(E)** with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the Case Management/Electronic Case Files (CM/ECF) system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: */s/ Grayson S. Walker*
GRAYSON SANG WALKER
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 697-4091